# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

SUSAN KING,                          :
                                     :
            Plaintiff,               :        NO. 3:04cv2098 (MRK)
                                     :
v.                                   :
                                     :
THE UNITED STATES OF AMERICA,        :
                                     :
            Defendant.               :


## MEMORANDUM OF DECISION

In this personal injury action, Plaintiff Susan King asserts that she was injured while working as a contractor at the Naval Submarine Base in Groton, Connecticut. Ms. King seeks to hold the United States liable for her injuries under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2680(a), because she sustained the injuries while working in a federal building.[1] The United States has moved for summary judgment on the ground that it is immune from Ms. King's suit for damages. For the reasons explained below, the Court GRANTS in PART and DENIES in PART Defendant's Motion for Summary Judgment [doc. # 46].

---

[1] Ms. King also filed a related action against Gordon England, in his capacity as the Secretary of the Navy, under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, for allegedly discriminating against her on account of the alleged injuries for which Ms. King sues in this case. *See King v. England*, No. 05cv949 (MRK). In a separate opinion issued in that action, the Court has granted Secretary England's motion for summary judgment.

# I.

The following forms the factual background to Ms. King's claims. As is required on a motion for summary judgment, the Court relates the facts in the light most favorable to Ms. King.[2] The Court will provide additional facts in connection with its discussion of the parties' legal claims.

Ms. King worked as a social worker in the Fleet and Family Support Center ("Family Support Center") of the Naval Submarine Base New London, in Groton, Connecticut (the "Groton Base"), from November 18, 2002, through February 21, 2003. Ms. King was employed under a contract between the Navy and her employer, Information Network Services.

The Family Support Center was located at all relevant times in Building 83 of the Groton Base, and Ms. King worked in that building. Beginning in January 2003, Building 83 underwent renovations. Instead of relocating all personnel out of Building 83 during the course of the renovations, the Navy decided to use a "'swing space' method of relocating one area of the building at a time while the renovation work in the particular area was completed." Ex. J para. 16. This decision was made in part due to the limited amount of available space on the Base, as well as the unique requirements of the Family Support Center. *See id.*; *King v. England*, 05cv949(MRK), Local Rule 56(a)1 Statement [doc. # 35] Ex. P at 4 (affidavit of Paul East).[3]

---

[2] The facts are taken from the uncontested statements in Defendants' Local Rule 56(a)1 Statement [doc. # 26-15], unless otherwise noted.

[3] While neither party has formally incorporated by reference the materials filed in the companion case, *King v. England*, No. 05cv949 (MRK), the Court nevertheless considers them because Ms. King is represented by the same counsel in both cases, summary judgment papers and briefing were coordinated in both cases, the motions in both cases were argued together, and counsel for the United States relied, without objection, upon certain exhibits in the companion case at oral argument before the Court.

The renovation work was performed by Newfield Construction Company ("Newfield"), a private construction company under contract with the Navy. During the course of Newfield's work on Building 83 on February 3 or 4, the contractor set up temporary lighting in the building's basement. On the afternoon of February 6, employees at the Family Support Center noticed a burning smell in the office. These employees, including Ms. King, reported the offensive smell to their immediate supervisor, Lynn-Marie Smith-Martin. Two clinicians in addition to Ms. King reported a burning feeling in their noses and scratchy throats. After receiving these reports of odor and discomfort, Ms. Smith-Martin reported the complaints to her supervisor, Paul East, who was the Director of the Family Support Center. At Mr. East's request, a representative from either the Base Safety Office or the Industrial Hygiene Office came to the Family Support Center offices on February 6. Mr. East further reported these complaints to Robert Brese, the Executive Officer of the Groton Base.

The Groton Base was closed the next day, February 7, due to snow, and when the employees returned to work on the following Monday, February 10, Ms. King and other members of the Family Support Center administrative staff reported to Ms. Smith-Martin that the odor remained in their offices. Ms. Smith-Martin again informed Paul East of these reports.

Later on the morning of February 10, Barbara Ross, Program Manager for the Family Support Center, investigated the odors. Ms. Ross reported to Ms. Smith-Martin that she would check Ms. King's office and that she would contact the Safety Office and inform Mr. East of the situation. The Safety Office investigated the situation but was unable to determine the origin of the odor. Soon thereafter, Natali Krause from the Industrial Hygiene Department came to Building 83 to investigate the odor. Ms. Krause, an Industrial Hygienist, noticed that a burning smell was still present. She

spoke with the employees about the reactions they were having and how long the smell had persisted. She also advised the employees to open the windows for fresh air and to go to the base Occupational Health Office if they continued to experience symptoms.

Ms. Krause followed the odor down a flight of stairs and into a basement hallway, where she saw that the plastic protective cages surrounding light bulbs, which had been brought in by the contractors for the renovation project, had melted. Ms. Krause concluded that this situation was the likely source of the offensive odor. The cages were then changed and the other employees who experienced discomfort reported that their symptoms subsided later that morning. Ms. Krause confirmed with contractor personnel that no chemicals had yet been used during the course of the renovation in that area of Building 83, but that a limited amount of bleach and spray paint had been used in other sections of the building. *See* Pl.'s Exs. 12, 13; Ex. M. Ms. Krause believed that the problem had been fully resolved, and Ms. King returned to her office once Ms. Krause had left.

However, on the following morning, February 11, Ms. King was told not to go into her office in Building 83, because Mr. East and Ms. Krause intended to enter it together to investigate the odor. Mr. East also requested a meeting with the Public Works department to discuss the situation. Family Support Center employees were notified both about the meeting and that the Industrial Hygiene Department and the Occupational Health/Preventive Medicine Department would continue to inspect the offices.

Ms. King spent the morning of February 11 working in another clinician's office on the same floor of Building 83, and she continued to smell the odor at one end of the office corridor. However, neither Ms. Krause nor Mr. East detected any offensive odor in Ms. King's office. Nevertheless, because employees had reported that the odor had been strongest in Ms. King's office, Mr. East

arranged temporarily to relocate Ms. King downstairs on the main floor of Building 83. On February 12, Ms. King called in sick and did not report to work. On the following day, Ms. Smith-Martin arranged for Ms. King's belongings to be moved down to the main floor of Building 83. While Ms. King worked for most of February 13 on the main floor, she says that she still smelled and reacted to the odor in the upstairs hallway.

On Friday, February 14, Ms. King called in sick, and on Monday, February 17, the Family Support Center was closed because of a national holiday. From February 18 through 20, 2003, Ms. King was out of the office on approved leave. Mr. East continued to check Ms. King's original office space each day to assess whether any odor had returned. In this period of time, Mr. East does not recall any complaints from those who worked in Building 83 regarding odors or general air quality.

On February 21, 2003, Ms. King returned to work. When she reported that morning to the alternate office provided for her on the main floor of Building 83, Ms. King suffered another serious reaction and again left work.[4] Her reaction was so severe that she went to the Westerly Urgent Care Facility, as she had done several times since her first exposure to the odors in early February. A doctor at the facility provided Ms. King with a note stating that she be excused from work from February 21, 2003 to February 26, 2003. Ms. King did not report to Building 83 again after February 21, 2003, and she no longer works at the Groton Base. Ms. King was ultimately diagnosed with "[i]rritant-induced allergic rhinoconjunctivitis as well as pharyngitis with associated asthma symptoms," which her doctor believed "within a reasonable degree of medical certainty" to be related

---

[4] Several employees at the Family Support Center smelled a diesel-like odor on the morning of February 21, in the area by the window of the administrative office space. An investigator was dispatched from either the Safety Office or the Industrial Hygiene Department. The investigator concluded that the diesel fumes were most likely the result of delivery vehicles idling near the offices, and the fumes did not continue beyond a brief period on that morning.

to her "exposure to irritants in her work place." *King v. England*, 05cv949(MRK), Local Rule 56(a)1 Statement [doc. # 35] Ex. B at 2.

At the end of February 2003, the Industrial Hygiene Department performed air quality testing in the Family Advocacy Program offices. The findings were communicated to Mr. East and the rest of the staff in late February, and a report was issued on March 6, 2003. The report revealed that (1) "ventilation in the counseling offices was not functional"; (2) "[a]lthough there was significant airflow in the hallway outside FS from south to north, airflow within the counseling office was minimal"; (3) "[r]elative [h]umidity was low . . . and temperatures were high"; and (4) "no contaminants above OSHA limits or EPA Recommended Values [were] found." Ex. M paras. 4-6.[5]

## II.

The summary judgment standard is a familiar one. Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica College of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (internal quotation marks omitted). "The substantive law governing the case will identify those facts

---

[5] While there is evidence that Newfield conducted limited spray painting in a different section of the building, *see, e.g.*, Pl.'s Exs. 12, 13, and that Newfield used a small amount of bleach while cleaning the basement, *see* Ex. M, the evidence shows that no other chemicals had yet been used during the course of the renovation, *see* Pl.'s Ex. 12 (email from Paul East stating that Newfield had not yet sprayed for roaches); Pl.'s Ex. 13 ("Ms. Krause investigated with the contractor personnel and found that no other work involving chemicals had been done."), and that asbestos removal had not yet begun, *see* Pl.'s Ex. 12 ("Newfield has not done any asbestos removal . . . ."); Pl.'s Ex. 13 ("Asbestos work has not been started yet.").

that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (alteration in the original)). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986), and the Court must resolve all ambiguities and draw all inferences in favor of the plaintiff, *see Anderson*, 477 U.S. at 255. If the moving party carries its burden, the party opposing summary judgment "may not rest upon . . . mere allegations or denials . . . ." Fed. R. Civ. P. 56(e). Rather, the opposing party must "set forth specific facts showing that there is a genuine issue for trial." *Id.* In short, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (internal citations omitted).

### III.

The United States is immune from damages actions unless it expressly waives its sovereign immunity. *See Lane v. Pena*, 518 U.S. 187, 192 (1996). That is just what the United States did in enacting the FTCA. As the Supreme Court has explained, the FTCA "waives sovereign immunity" and thereby "confers federal-court jurisdiction in a defined category of cases involving negligence committed by federal employees in the course of their employment." *Dolan v. United States Postal Serv.*, 546 U.S. 481, 484 (2006). The FTCA's jurisdictional grant covers the following:

claims against the United States, for money damages, . . . for . . . personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government . . . , under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1). Here, Ms. King asserts that the United States is liable to her for damages because it negligently caused her injuries in the following manner: (1) by failing to inform her of the risk from the chemicals used during the renovation work on Building 83; (2) by improperly clearing Building 83 as safe for her to return to work on February 10; (3) by failing to properly ventilate the work space; and (4) by employing allegedly hazardous materials during the course of the renovation. Ms. King claims that the United States is liable not only for the actions of its own Navy personnel, but also for the acts or omissions of Newfield, because the Navy supervised Newfield's work.

Although the FTCA "waives sovereign immunity," that waiver is, nonetheless, a limited one. *United States v. Idaho*, 508 U.S. 1, 6-7 (1993). Therefore, "due regard must be given to the [FTCA's] exceptions." *United States v. Orleans*, 425 U.S. 807, 814 (1976); *see also Leone v. United States*, 910 F.2d 46, 48 (2d Cir. 1990) ("The FTCA is a limited waiver of sovereign immunity making the Federal Government liable to the same extent as a private person for certain torts of employees of the [G]overnment acting within the scope of their employment."). As the Supreme Court has put it: "The FTCA qualifies its waiver of sovereign immunity for certain categories of claims (13 in all). If one of the exceptions applies, the bar of sovereign immunity remains." *Dolan*, 546 U.S. at 485.

The United States claims that several exceptions to FTCA liability apply in this case and that as a result, it is entitled to summary judgment. In particular, the United States argues that it is immune from Ms. King's damages lawsuit on three independent grounds. First, to the extent Ms.

King claims that her injuries were caused by the negligence of the Newfield contractors working on Building 83, the United States asserts that her claims are precluded by the independent contractor exception to the FTCA, which is codified at 28 U.S.C. § 2671. Second, the United States contends that to the extent Ms. King alleges that any of her injuries were caused by the negligence of the Navy or its personnel, her claims are barred by the discretionary function exception to the FTCA, found at 28 U.S.C. § 2680(a). Third and finally, the United States argues Ms. King cannot use the FTCA because the United States would not be liable for her injuries if it were a private entity. *See* 28 U.S.C. § 1346(b)(1) (allowing recovery to the extent the United States would be liable if it were a private person). According to the United States, it requires contractors such as Information Network Systems to provide worker's compensation insurance and as a consequence, the Connecticut Workers' Compensation Act, Conn. Gen. Stat. § 31-284(a), would provide the exclusive remedy for Ms. King if the United States were a private entity. The Court will consider each defense in turn.

### A.    Independent Contractor Exception

By its terms, the FTCA allows recovery only for injuries "caused by the negligent or wrongful act or omission of any employee of the Government." 28 U.S.C. § 1346(b)(1). The Act defines "[e]mployee of the Government" as including "officers or employees of any federal agency," but it also states that the term "does not include any contractor with the United States." 28 U.S.C. § 2671. Here, the United States argues that § 2671 bars Ms. King's claims to the extent she was injured by the acts or omissions of Newfield, because Newfield was an independent contractor for the Navy. Ms. King counters that the work performed by Newfield was under the direct control of both Newfield and the Navy, and therefore, Newfield contract workers effectively functioned as "employees" of the Navy.

Whether a person is a government employee or an independent contractor is a question of federal law. *Leone*, 910 F.2d at 49. Supreme Court precedent teaches that a "critical element in distinguishing an agency from a contractor is the power of the Federal Government 'to control the detailed physical performance of the contractor.'" *Orleans*, 425 U.S. at 814 (quoting *Logue v. United States*, 412 U.S. 521, 528 (1973)). In making that determination, the Court must consider whether the Navy exercised "control of the detailed physical performance of" Newfield, and supervised "its day-to-day operations." *Roditis v. United States*, 122 F.3d 108, 111 (2d Cir. 1997) (per curiam) (internal quotation marks omitted).

To meet that standard, Ms. King first points to section 1.5 of the contract between the Navy and Newfield, which she says shows that the parties entered into a partnership to renovate Building 83, and not an owner-independent contractor relationship. That provision, entitled "Partnering," states the following:

> LEVEL B PARTNERING    In order to most effectively accomplish this contract, the Government requires the formation of a cohesive partnership with the contractor and its subcontractors. In addition, other key personnel, including the client who will occupy the facility, the designer-of-record, principal individuals from the Government, the project sponsor, and the representative(s) of the facility owner will also be invited to participate in the partnering process. The partnership will strive to draw on the strengths of each organization in an effort to achieve a quality project done right the first time, within budget, on schedule, without any lost-time mishaps, and with the contractor making a reasonable profit. It should be anticipated that the initial session will be one-day minimum and the follow-on sessions, held once every three months or as agreed to by the partners, will be half-day minimum. Although subject to bilateral agreement before the initial session, it may prove beneficial to hold the partnering sessions away from the project site location. This will minimize interruptions during the sessions and will allow the members of the partnership to enhance working relationships through discussions and interaction.

Pl.'s Ex. 7. Ms. King also directs the Court's attention to another document in the record–the "Building 83 Renovation Partnering Attendance List"–which names twenty-seven individuals who

attended one of the partnering meetings mentioned in section 1.5. *See* Pl.'s Ex. 9. This list includes a number of Navy personnel, notably John Alberghini, the "Resident Officer in Charge of Construction" ("ROICC"), Robert Howland, the Assistant ROICC, and Jim Besse, an Engineering Technician who worked in the office of the ROICC and who was named in two daily status reports and one production report submitted by Newfield to the Navy. *See* Ex. H (Contractor Quality Control Report dated 2/3/03) ("Demolition began in the third floor restroom, this work is not in phase 2. B. Johnson and J. Besse trying to see if it can still be done at this time."); *id.* (Contractor Quality Control Report dated 2/4/03) ("Jim Besse said we could start boxing the lamps so they don't get broken."); Ex. L (Production Report dated 2/11/03) ("Had a meeting with f&f, gem, and nci to discuss steps we are going to follow to remove roof top units. We may look into using a helicopter to set units, J. Besse said it was possible but there are a lot of clearance procedures that will have to be taken."). Finally, Ms. King cites to section 1.15.2 of the contract, entitled Contractor Quality Control Report, which required Newfield to submit reports "for each day that work is performed," and lists many specific details that each Report must include. Pl.'s Ex. 8.[6]

Neither the contract provisions quoted by Ms. King nor the project meetings or reporting she cites demonstrate anything beyond macro-level involvement by the Navy, which–like any owner–had a keen interest in monitoring the progress of its contractor. That evidence does not even remotely show that the Navy controlled "the detailed physical performance of" Newfield and supervised "its

---

[6] Ms. King also points to a February 20, 2003 email from Mr. East to Robert Brese, the Executive Officer of the Naval Base, in which Mr. East reported on the alleged injuries of Ms. King and the actions taken by Navy personnel and Newfield after the initial report of the odor. *See* Pl.'s Ex. 12. However, Ms. King never explains how this email (sent two weeks after the initial complaints about the odor) evidences the Navy's control over Newfield's day-to-day operations, and the Court itself is at a loss to understand how this email advances Ms. King's argument.

day-to-day operations," *Roditis*, 122 F.3d at 111 (internal quotation marks omitted), as is required by the FTCA.

To the contrary, the United States has submitted an unrebutted affidavit from Mr. Howland, who states that "[n]either I, nor anyone on my staff, had authority to control or direct the day-to-day activities of the Newfield Construction Company workers in the renovation of Building 83." Ex. E para. 5. Indeed, Mr. Howland notes that Newfield "was required, by . . . contract, to have a construction superintendent at the work site at all times when renovation or construction was underway to directly superintend the work." *Id.* para. 6; *see* Ex. F (incorporating 48 C.F.R. § 52.236-6 "Superintendence by the Contractor"); Ex. G ("At all times during performance of this contract and until the work is completed and accepted, the Contractor shall directly superintend the work or assign and have on the worksite a competent superintendent who is satisfactory to the Contracting Officer and has authority to act for the Contractor."). Mr. Howland also confirms that Newfield "was responsible for all decisions regarding the choice of materials to be used in the renovation, the construction methods used, the possible use of hazardous materials, and the safety of the work area." Ex. E para. 9. Finally, Mr. Howland states that Newfield "was responsible for ensuring the safety of the work area in Building 83 during the renovation of Building 83, from February 6, 2003, through February 21, 2003," *id.* para. 10, and that "[t]he area in Building 83 where the renovation was being performed was a restricted work zone, hard-hat area, under the direct control of Newfield . . . at all times during the period from February 6, 2003, through February 21, 2003." *Id.* para. 11.

Ms. King has provided no evidence, other than the document listing the Navy employees in attendance at what appears to have been high-level project meetings, to contest Mr. Howland's sworn affidavit that no Navy employee supervised Newfield's day-to-day actions in renovating Building

83. The fact that Newfield issued quality control status reports to the Navy or attended senior project progress meetings with Navy personnel does not transform Newfield into the functional equivalent of a government employee. *Leone*, 910 F.2d at 50 (the fact that the Government may act as an "overseer" does not show that it manages the "details of [a contractor's] work or supervise[s] him in his daily duties"). As the Second Circuit has observed, "the government's retention of a right to inspect the progress of construction does not convert a contractor into a federal employee." *Roditis*, 122 F.3d at 111 (citing *Leone*, 910 F.2d at 50). Furthermore, that court has also held that "detailed regulations and evaluations are an insufficient basis to satisfy the strict control test. The question is not whether a contractor must comply with federal regulations and apply federal standards, but whether its day-to-day operations are supervised by the Federal Government." *Leone*, 910 F.2d at 50 (citation omitted); *see id.* (holding that the Aviation Medical Examiners ("AME") were independent contractors even though "each AME acts under the Federal Air Surgeon's general supervision, and the FAA continuously evaluates the AMEs") (citation omitted).

Here, there is no evidence that the Navy supervised the day-to-day operations of Newfield. Indeed, all of the evidence is directly to the contrary. Therefore, taking all facts and inferences in Ms. King's favor, the Court concludes that Newfield was an independent contractor within the meaning of the FTCA. Accordingly, Ms. King cannot recover from the United States for acts or omissions of Newfield.

### B.    Discretionary Function Exception

The Court's ruling that Newfield was an independent contractor is not the end of the inquiry, however, for "[t]he fact that an independent contractor may have been responsible for [plaintiff's injury] cannot be viewed as relieving the United States from liability where the plaintiff alleges that

federal employees also may have caused or contributed to the alleged tort." *Berkman v. United States*, 957 F.2d 108, 114 (4th Cir. 1992). Here, Ms. King alleges that Navy personnel themselves acted negligently in causing her injuries. Ms. King does not contend that the Navy acted negligently either in hiring Newfield as its contractor or in deciding to renovate Building 83, *see* Mem. of Law in Opp'n [doc. # 28] at 10. Instead, she asserts that Navy personnel were negligent in the following two ways: (1) by "clearing" the basement area as safe for Ms. King to return to work on February 10, 2003, when the environment was still unsafe; and (2) by creating and maintaining a hazardous environment–namely, Building 83–including failing to ventilate Ms. King's workspace, and failing to warn Ms. King that she was working in a "sick building."

The United States argues that even if the actions of Navy personnel contributed to Ms. King's injuries (an issue the Navy disputes), the FTCA nonetheless bars this action because any actions of Navy personnel fall within the FTCA's "discretionary function exception." According to the discretionary function exception, the United States does not waive sovereign immunity as to "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a); *see Coulthurst v. United States*, 214 F.3d 106, 108 (2d Cir. 2000). As the Supreme Court has observed, this exception "'marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals.'" *Berkovitz v. United States*, 486 U.S. 531, 536 (1988) (quoting *United States v. S. A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 808 (1984)).

The Supreme Court has developed a two-prong test for determining whether the discretionary function exception applies in a given case. The United States has the burden of proving that both requirements are met. *See Carboniero v. United States*, 211 F.3d 714, 756 n.5 (3d Cir. 2000); 14 Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, *Federal Practice and Procedure* § 3658.1, at 639 (3d ed. 1998) ("[M]ost courts have concluded that the burden of proving the applicability of the discretionary-function exception falls upon the United States."). Where both prongs are satisfied, the conduct falls outside the FTCA's waiver of sovereign immunity, and the Court lacks subject matter jurisdiction. *See Fazi v. United States*, 935 F.2d 535, 537-38 (2d Cir. 1991).

First, a court must look to see whether the acts in question "'involv[e] an element of judgment or choice.'" *United States v. Gaubert*, 499 U.S. 315, 322 (1991) (quoting *Berkovitz* 486 U.S. at 536 (citations omitted) (alteration in original)); *see also id.* ("'[I]t is the nature of the conduct, rather than the status of the actor' that governs whether the exception applies.") (quoting *Varig Airlines*, 467 U.S. at 813). According to the Supreme Court, "The requirement of judgment or choice is not satisfied if a 'federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow,' because 'the employee has no rightful option but to adhere to the directive.'" *Id.* (quoting *Berkovitz*, 486 U.S. at 536). In this case, Ms. King has pointed to no statute, regulation, or policy mandating any particular action that Navy personnel either took or failed to take. Because the acts at issue in this case are "acts that 'involv[e] an element of judgment or choice,'" *Gaubert*, 499 U.S. at 322, the United States has satisfied the first part of the Supreme Court's test.

Second, "[b]ecause the purpose of the exception is to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through

the medium of an action in tort," a court must next determine whether the governmental actions and decisions at issue were based "on considerations of public policy." *Id.* at 323 (quoting *Berkovitz*, 486 U.S. at 537) (internal citations and quotation marks omitted). The focus of the court's inquiry is not on the "agent's subjective intent in exercising the discretion conferred . . . but on the nature of the actions taken and on whether they are susceptible to policy analysis." *Id.* at 325. However, "even assuming the challenged conduct involves an element of judgment, it remains to be decided whether that judgment is of the kind that the discretionary function exception was designed to shield." *Gaubert*, 499 U.S. at 322-23 (internal quotation marks omitted); *see Berkovitz*, 486 U.S. at 546-47 ("[I]f the Bureau's policy leaves no room for an official to exercise policy judgment in performing a given act, or if the act simply does not involve the exercise of such judgment, the discretionary function exception does not bar a claim that the act was negligent or wrongful."). The Court is also mindful that "[w]hen established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a [g]overnment agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Andrulonis v. United States (Andrulonis II)*, 952 F.2d 652, 654 (2d Cir. 1991) (internal quotation marks omitted). That presumption can be rebutted, however, if "the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime." *Gaubert*, 499 U.S. at 324-35.

1.     **Clearing Building 83 as Safe for Ms. King to Return to Work on February 10**.

Ms. King first argues that the Navy's Safety Office should not have cleared Building 83 as safe for her to return to work on February 10, 2003, several days after she first noticed odors in the building

and began to have an adverse reaction to them,[7] and that the decision to do so is not "susceptible to policy analysis." *Id.* at 325. The United States responds that this decision "falls squarely within the discretionary function exception" because "[t]he nature of the Safety Office's decisions in response to particular situations necessarily requires the balancing of policy concerns, including safety and efficiency, to choose between available options." Reply to Pl.'s Opp'n Mem. [doc. # 39] at 7 n.2.

As this case illustrates, "[d]etermining whether specific conduct is protected by the discretionary function exception to the FTCA is sometimes difficult. . . . The principal difficulty is simply that all federal employees exercise a certain amount of discretion in the discharge of their responsibilities." *Andrulonis v. United States (Andrulonis I)*, 924 F.2d 1210, 1218 (2d Cir. 1991) (internal quotation marks omitted).[8] The exception most certainly bars claims based on day-to-day management decisions "if those decisions require judgment as to which of a range of permissible courses is wisest," *Fazi*, 935 F.2d at 538. However, "[t]here are obviously discretionary acts performed by a Government agent that are within the scope of his employment but not within the discretionary function exception because these acts cannot be said to be based on the purposes that the regulatory regime seeks to accomplish." *Andrulonis II*, 952 F.2d at 655.

---

[7] In deciding this motion for summary judgment, the Court must take all facts in the light most favorable to the plaintiff, and adopts Ms. King's account of the events in early February. However, at the time of trial, the Defendants are free to contest both their knowledge of her condition and whether Navy personnel officially cleared the building for Ms. King's return to work on February 10.

[8] The Second Circuit issued its first opinion in *Andrulonis*, 924 F.2d 1210, before the Supreme Court decided *Gaubert*. That opinion was vacated in light of *Gaubert* by *N.Y. State Dep't of Health v. Andrulonis*, 502 U.S. 801 (1991) (mem.), and the Second Circuit reinstated its original opinion and added to its analysis in *Andrulonis v. United States,* 952 F.2d 652. For convenience, the Court refers to the Second Circuit's pre-*Gaubert* opinion as *Andrulonis I* and its post-*Gaubert* opinion as *Andrulonis II*.

In seeking guidance to resolving this difficult issue, the Court has looked to Second Circuit precedent involving the discretionary function exception. The Second Circuit has rejected the Government's assertion of the discretionary function exception where the plaintiff alleged that: individual prison guards negligently enforced a policy decision, *see Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471 (2d Cir. 2006); *Coulthurst v. United States*, 214 F.3d 106 (2d Cir. 2000); a government scientist negligently failed to warn of the dangers of a particular scientific experiment, *Andrulonis II*, 952 F.2d 652; and government employees negligently patrolled a beach, *Caraballo v. United States*, 830 F.2d 19 (2d Cir. 1987); *see also Indian Towing Co. v. United States*, 350 U.S. 61, 69 (1955) (careless maintenance of a lighthouse triggers liability). On the other hand, the Second Circuit has found the discretionary function exception to apply where plaintiffs challenged a prison policy regarding the monitoring of exercise equipment, *see Coulthurst,* 214 F.3d 106, and a postal service policy not to provide protection to mail carriers, *see Fazi*, 935 F.2d 535.[9]

The Court finds the Second Circuit's decisions in *Andrulonis I* and *II* most instructive for present purposes. In both *Andrulonis* decisions, the Second Circuit rejected the Government's argument that the discretionary function exception barred recovery for the plaintiff's injuries, which were caused when he contracted rabies during the course of a laboratory experiment that Dr. Baer,

---

[9] Courts around the country have reached different conclusions regarding the scope of the discretionary function exception and what actions fall within it. *Compare, e.g.*, *Gotha v. United States*, 115 F.3d 176 (3d Cir. 1997) (denying application of the exception where the Navy failed to provide safeguards on a footpath on a Navy underwater tracking range), *and Duke by Duke v. Dep't of Agric.*, 131 F.3d 1407 (10th Cir. 1997) (denying application of the exception where the Forest Service failed to warn or protect against the danger of a boulder rolling down a man-made slope in a national forest), *with Shansky v. United States*, 164 F.3d 688 (1st Cir. 1999) (finding the exception applicable where the Park Service took into account aesthetic considerations, as well as safety concerns, in failing to install a handrail on a historic site), *and Fazi*, 127 F.2d at 538-39 (finding that the decision whether to provide protection to contract carriers was discretionary).

a government scientist, facilitated and observed.  *See Andrulonis I*, 942 F.2d at 1219; *Andrulonis II*, 952 F.2d at 655.

In its original decision, the Second Circuit distinguished "the [G]overnment's decisions to encourage rabies research, provide funding for the research, and provide [the New York State Department of Health] with the [rabies] virus"–each of which "implicated policy considerations and therefore were protected by the discretionary function exception"–from "Dr. Baer's alleged failure to warn of the extreme dangers presented by the particular circumstances of the . . . experiment which Dr. Baer failed to interrupt."  *Andrulonis I*, 924 F.2d at 1219.  According to the Second Circuit, the situation presented "simply did not lend itself to policy balancing . . . .  His is precisely the type of negligent omission for which [C]ongress waived the [G]overnment's sovereign immunity . . . ."  *Id.*

On remand from the Supreme Court following its decision in *Gaubert*, the Second Circuit reaffirmed its earlier ruling and reconciled it with *Gaubert*, pointing out the special attention the Supreme Court had placed on the existence of "a clear regulatory scheme [that] entrusted government agents with discretionary powers to effectuate a clearly-defined policy."  *Andrulonis II*, 952 F.2d at 655.  The Second Circuit rejected the Government's argument that Dr. Baer's decisions were similarly grounded in policy, in part, because there was "neither a regulatory framework nor a defined policy that could serve as the basis for infusing all decisions of CDC employees with policy implications."  *Id.*  Indeed, the court noted, "[n]othing indicates that CDC policy required, or even encouraged, Dr. Baer to ignore unsafe laboratory conditions and thereby unnecessarily place the lives of laboratory workers at risk in order to further a scientific cause or any other objective of the [G]overnment."  *Id.*

While the United States in this case argues that the Navy did have such a policy in choosing to relocate only some workers out of Building 83 during renovations instead of relocating all the workers, there is in fact no evidence in the record that the Navy had adopted a policy that all workers not relocated would be required to remain on the premises in the event that Newfield created a dangerous situation that became known to the Navy. Indeed, as the Court pointed out at oral argument, the Navy's broad claim that all of the Safety Office's actions should be considered policy decisions would substantially increase the coverage of the discretionary function exception. *Cf. id.* ("[The Government's] attempt to sweep all of [CDC-employed] Dr. Baer's acts and omissions under the rug of broad CDC policy would effectively insulate virtually all actions by a government agent from liability, excepting only those where the agent had acted contrary to a clear regulation.").

The Court draws additional guidance for its determination from the Third Circuit's decisions in *Cestonaro v. United States*, 211 F.3d 749 (3d Cir. 2000), and *Gotha v. United States*, 115 F.3d 176 (3d Cir. 1997). In *Gotha*, the Third Circuit rejected the Navy's appeal to broad policy concerns in failing to provide safeguards on a footpath because the court found the Navy's argument so broad that it "conceivably could go to any decision by the Navy." *Gotha*, 115 F.3d at 181. The court observed that "[t]his case is not about a national security concern, but rather a mundane, administrative, garden-variety, housekeeping problem that is about as far removed from the policies applicable to the Navy's mission as it is possible to get." *Id.* In *Cestonaro*, the Third Circuit similarly rejected the National Park Service's argument that the discretionary function exception shielded its decision to provide some lighting and no warning signs at an unofficial parking lot that had a history of crime and where the plaintiff's decedent was killed. As the court stated, "the events surrounding Daniele Cestonaro's death are no more related to the National Park Service's policies

than were the events surrounding Ms. Gotha's broken ankle related to the Navy's overarching policies." *Cestonaro*, 211 F.3d at 756. The Third Circuit reiterated that the fact that "torts stemming from garden variety decisions fall outside the discretionary function exception is consistent with a primary motive behind the FTCA." *Id.* at 755 (citing *Dalehite v. United States*, 346 U.S. 15, 28 & n.19 (1953)).

In this case, a representative from the Industrial Hygiene or Safety Office came to investigate the odors on February 6, when Ms. King first reported her adverse reaction, but did not discover their source. It was not until February 10 that another investigator discovered the melting lightbulb casings and directed that they be replaced. That action occurred after Ms. King, whose office experienced the worst of the fumes, returned to work and to her office. Then, it was another full day until Mr. East decided to move Ms. King to another section of the building, away from the fumes that she still smelled.

While the question presented is a close one, the Court nevertheless concludes that this is not a situation in which "a clear regulatory scheme entrusted government agents with discretionary powers to effectuate a clearly-defined policy." *Andrulonis II*, 952 F.2d at 655. Although the Defendant points to the Navy Occupational Safety and Health Program Manual ("NAVOSH Manual"), *see* Ex. N, and argues that any decision to clear Building 83 must be presumed to be grounded in light of that policy statement, the Court disagrees. The NAVOSH Manual "does not address 'clearance' of work spaces during building renovations," Mem. in Supp. [doc. # 26] at 13, focusing instead on higher-level policy concerns. Neither did the decisions at issue affect millions of dollars in resources, or many individuals, or substantial long-term planning. Instead, the actions–at their core–involved a decision to allow a single individual, who had already experienced

a severe reaction to the odors present, to return to work in Building 83. In sum, the allegedly negligent actions taken here were not "based on the purposes that the regulatory regime seeks to accomplish," *Andrulonis I*, 952 F.2d at 655; rather, this was a one-time decision involving one employee. Therefore, the discretionary function exception does not bar Ms. King's claim that Navy personnel were negligent in deciding to return her to Building 83 on February 10.

2. **Negligent Maintenance of Building 83 and Failure to Warn.** Ms. King next argues that Building 83 itself was the source of her injury, and that the Navy had the "responsibility for maintaining a clean environment free of toxins." Mem. in Opp'n [doc. # 28] at 7. Ms. King points to several environmental conditions that the building had historically suffered, such as the presence of asbestos, fiberglass dust and mold, as well as low humidity, high temperature, and poor ventilation. Ms. King claims that Building 83 had a well-documented history of causing respiratory problems for workers. In those circumstances, Ms. King argues, the Navy never should have allowed employees to remain on premises during the renovations to Building 83. *See* Pl.'s Ex. 4 at 4-5 ("This job must be performed when personnel are not working in the area, and any dust generated in the workplace must be cleaned up before FSC personnel return to work."). Ms. King further claims that the Navy's failure to relocate all workers during the course of Building 83 violated its common-law duty under Connecticut law, as the "owner" of Building 83, to "exercise . . . reasonable care to have and keep [Building 83] reasonably safe for the reasonably to be anticipated uses which [she] would make of them." *Facey v. Merkle*, 146 Conn. 129, 133 (1959).

Ms. King's theory of liability is multi-faceted and therefore susceptible to several interpretations. To the extent Ms. King is complaining about Newfield's actions in allegedly stirring up dangerous materials that otherwise would lay dormant in Building 83, the Court has previously

stated that Newfield was an independent contractor, to whom the Navy delegated responsibility for "the choice of materials to be used in the renovation, the construction materials used, the possible use of hazardous materials, and the safety of the work area." Ex. E para. 9. The Navy's delegation of authority to Newfield to determine the precise manner of construction on the project fits well within its discretionary authority. *See* Ex. O para. 7; *see also Maltais v. United States*, 546 F. Supp. 96 (N.D.N.Y. 1982) (holding that government agency's delegation of its responsibility for safety to the general contractor was a discretionary act within the meaning of 28 U.S.C. § 2680(a), and thus was exempted from FTCA liability), *aff'd without published opinion*, 729 F.2d 1442 (2d Cir. 1983). As the Second Circuit stated in *Roditis*, "any state law nondelegable duty cannot, on its own, override the United States' sovereign immunity from suits for injuries caused by its independent contractors." 122 F.3d at 111.

In another sense, Ms. King can be understood as complaining about the Navy's decision not to remove all workers from Building 83 during the course of the renovation work. To that extent, her claims involve decisions by the Navy that are "susceptible to policy analysis," *Gaubert*, 499 U.S. at 325, and did in fact involve a meaningful balancing of interests by those charged to exercise that kind of judgment. Indeed, Mr. East's unrebutted affidavit demonstrates that Navy personnel took different policy considerations into account in arriving at the decision to use a "swing space" method to accommodate base needs and also conduct the renovation work. *See* Ex. J para. 16 ("I requested that all employees of the FFSC be moved out of the building during the renovation work, but the Public Works Office informed me that there was no space available on the base, and that vacating the FFSC offices during the renovation was not an option. Instead, the renovations would be

23

conducted using a 'swing space' method of relocating one area of the building at a time while the renovation work in the particular area was completed.").

The Navy was well aware of Building 83's general ventilation, temperature, and humidity issues; in fact, the issues cited by Ms. King led to the Navy's decision to renovate Building 83. *See* Ex. O para. 5; Pl.'s Ex. 6. The Navy decided that it would address these problems through a $11.6 million renovation project, the propriety of which Ms. King has not contested. By contrast to the decision to clear Building 83 for Ms. King's safe return to work on February 10, the decision to allow all employees to continue to use Building 83 during renovation work is a larger scale decision involving the effective use of the Groton Base and the sequencing of major construction on the base. It implicated policy judgments about how to maintain a major facility at the base, resolve perceived problems with the facility and continue to operate the base while those problems were being addressed. *See Baum v. United States*, 986 F.2d 716, 724 (4th Cir. 1993) ("The decision of how and when to replace a major element of a substantial public facility is . . . at bottom a question of how best to allocate resources."). In these circumstances, the Court concludes that the Navy's decision not to relocate all employees from Building 83 during renovation work is protected by the discretionary function exception. *See Gaubert*, 499 U.S. at 322-23; *Coulthurst*, 214 F.3d at 109.

Finally, Ms. King asserts a claim that the Navy failed to warn her of the dangers lurking within Building 83. That claim is without merit for several reasons. While Ms. King alleges that Building 83 itself was "toxic," there is no evidence that Ms. King had any adverse reaction to working in the building in the two and a half months she worked there before Newfield installed the temporary lighting. Ms. King points to several environmental reports relating to a buildup of asbestos, *see* Pl.'s Exs. 3, 6 (undated Executive Summary); mold, *see* Pl.'s Exs. 2, 3; and fiberglass

dust, *see* Pl.'s Ex. 4, 5; these reports date from 1995 to 2000, and Ms. King provides no evidence that such problems persisted in any severity, or indeed at all, in February 2003.[10]  In this regard, the Court notes that it is undisputed that Ms. King worked in Building 83 from November 2002 until renovation on the Building began in January 2003 and suffered no adverse health conditions until the light bulb casings melted in early February 2003.  Therefore, even if asbestos and fiberglass dust were present in Building 83, Ms. King offers no evidence that those substances affected her.  Finally, to the extent Ms. King claims that the Navy failed to warn her about the danger of remaining in the building during construction, which might create a risk of airborne asbestos and other contaminants, there is just no evidence that any such substances were in the air at that time.  In fact, the February 26, 2003 study of air quality confirms that there were no such toxins in the air.  *See* Ex. M at 2-3. Therefore, the Court GRANTS Defendant's Motion for Summary Judgment [doc. # 46] as to Ms. King's claims of negligent maintenance and failure to warn.

### C. Connecticut Workers' Compensation Act

The United States finally argues that the exclusive remedy found in the Connecticut Workers' Compensation Act, Conn. Gen. Stat. § 31-284(a)–which the United States contends applies here–takes this case outside the FTCA, which imposes liability on the Government only "to the same extent as a private individual under like circumstances," 28 U.S.C. § 2674.  Section 31-284(a) of the Connecticut General Statutes provides, in pertinent part, as follows:

> An employer who complies with the requirements of subsection (b) of this section shall not be liable for any action for damages on account of personal injury sustained by an employee arising out of and in the course of his employment . . . but an

---

[10] Ms. King includes in her submission an undated "Executive Summary (Reporting First Phase of Building 83 Evaluation)." However, the information used to create this summary was collected during the 1992-1995 period.  *See* Pl.'s Ex. 6.

employer shall secure compensation for his employees as provided under this chapter . . . .

Conn. Gen. Stat. § 31-284(a). Subsection (b) requires that any employer who does not provide satisfactory evidence of its "solvency and financial ability to pay directly to injured employees or other beneficiaries compensation provided by this chapter shall insure his full liability under this chapter . . . ." Conn. Gen. Stat. § 31-284(b). Although the Navy did not directly employ Ms. King (Information Network Services did), the Navy contends that it nevertheless was her "principal employer" within the meaning of the statute and therefore also entitled to the protection of § 31-284.

For the Navy to qualify as a principal employer under Connecticut's statute, it must first meet three requirements: "'(1) the relation of principal employer and contractor must exist in work wholly or in part for the former; (2) the work must be on or about premises controlled by the principal employer; [and] (3) the work must be a part or process in the trade or business of the principal employer.'" *Pelletier v. Sordoni/Skanska Constr. Co.*, 264 Conn. 509, 519 n.7 (2003) (quoting *Gigliotti v. United Illuminating Co.*, 151 Conn. 114, 118 (1963) (alteration in original)); *see* Conn. Gen. Stat. § 31-291. Section 31-291 originally contained only these three requirements, and if an entity could demonstrate that it satisfied these three requirements–as the Navy appears to have done here–§ 31-291 provided that the principal employer was protected by the exclusive remedy of the workers' compensation scheme. *Pelletier*, 264 Conn. at 520 ("By necessary implication, . . . as a result of the exclusivity provision of the Workers' Compensation Act, if a contractor *was* a 'principal employer' within the meaning of § 31-291, and therefore liable for workers' compensation benefits to an injured employee of the principal employer's subcontractor, it could not be held liable at common law to that same employee.").

However, in 1988, the Connecticut General Assembly amended § 31-291 to add an additional requirement:

> The provisions of this section shall not extend immunity to any principal employer from a civil action brought by an injured employee . . . under the provisions of section 31-293 to recover damages resulting from personal injury . . . *unless such principal employer has paid compensation benefits under this chapter to such injured employee* . . . for the injury or death which is the subject of the action.

Conn. Gen. Stat. § 31-291 (emphasis added). It is undisputed that the Navy did not pay Ms. King's workers' compensation benefits, and it is also undisputed that Ms. King's direct employer, Information Network Services, insured her pursuant to its Navy contract, which required Information Network Services to provide workers' compensation coverage for employees such as Ms. King. The United States argues that it did not have the authority to provide Ms. King with workers' compensation benefits, and that, although it did not directly pay for her workers' compensation insurance, as provided in § 31-291, it nonetheless satisfied the statutory requirement by requiring Information Network Systems by contract to provide workers' compensation insurance for her.

Commendably, the United States conceded at oral argument that no case has yet adopted its argument. And for good reason. For in the Court's view, the argument flies in the face of the plain language of the statute.

Connecticut courts have stated that the principal employer provision of the Connecticut Workers' Compensation Act was enacted to "afford full protection to workmen, by preventing the possibility of defeating the [Workers' Compensation] Act by hiring irresponsible contractors or subcontractors to carry on a part of the [principal] employer's work." *Pelletier*, 264 Conn. at 520 (quoting *Johnson v. Mortenson*, 110 Conn. 221, 225 (1929) (alteration in original)); *see also Pacileo v. Morganti, Inc.*, 10 Conn. App. 261, 263 (1987) (explaining that the law holds "the principal

employer, who has general control over the business liable, as if the principal employer directly employs all those who work on or at the business through subcontractors"). However, as the Connecticut Supreme Court explained:

> When an employee of a subcontractor was injured in the course of his employment and sought to recover common-law damages from the general contractor, he could not do so if the general contractor was a principal employer within the meaning of § 31-291; in that event, his remedy against the general contractor was limited to workers' compensation benefits. Because of the certificates of insurance required of the subcontractors and because of the benefits provided by the second injury fund, however, the principal employer was rarely called upon actually to pay those benefits. *Thus, principal employers enjoyed an immunity from suit for which they exchanged very little, if anything.*

*Pelletier*, 264 Conn. at 521-22 (emphasis added). Therefore the "purpose and effect of [the 1988] amendment was to limit the implied common-law immunity of the principal employer to the situation in which it had in fact paid the workers' compensation benefits that presumably were the basis of its immunity." *Id.* at 525.

Here, there is no doubt that the Navy did not in fact pay Ms. King's workers' compensation benefits. While it may be true that part of the price the Navy paid for Information Network Systems' services included the cost of maintaining workers' compensation insurance for its employees,[11] as is required by the Navy contract, the Connecticut legislature did not provide that method of complying with the requirements of the 1988 amendment. *See Pelletier*, 264 Conn. at 525 n.10 (one of the sponsors commenting that the bill would allow employees to sue their principal employer "[i]f he is not paying the [employee's] or the [dependents'] workers' compensation benefits for the accident.") (quoting 31 H.R. Proc., Pt. 11, 1988 Sess. at 3716). Indeed, in *Pelletier*, the Connecticut

---

[11] There is no evidence in the record regarding the nature of the Navy's contract with Information Network Systems–for example, whether it was a cost plus profit type of contract or a fixed monthly or yearly sum.

Supreme Court noted that the Connecticut General Assembly, in enacting the 1988 amendment, had rejected several policy arguments advanced in a Connecticut Appellate Court decision, *Ray v. Schneider*, 16 Conn. App. 660 (1988), one of which was identical to the argument made by the United States in this case. *Pelletier*, 264 Conn. at 529-30; *see Ray*, 16 Conn. App. at 668 ("It is to be expected that the cost of workers' compensation insurance will be included by the contractor in his contract price for undertaking to perform the inherently dangerous work and, therefore, will ultimately be financed by the employer who hires the independent contractor."). Accordingly, if a private company had required its contractor by contract to provide workers' compensation benefits to the contractor's employees, but did not itself pay for those benefits, the private company would not be shielded from liability by Connecticut's Workers' Compensation Act, but would instead be subject to a lawsuit in tort for damages. *See Pelletier*, 264 Conn. at 525. Because the FTCA by its plain language "waives sovereign immunity under circumstances where the United States, if a *private person . . .* would be liable," *United States v. Olson*, 546 U.S. 43, 45-46 (2005) (quoting 28 U.S.C. § 1346(b)(1) (internal quotation marks omitted) (alteration in original)), the Court rejects the United States' argument for immunity based upon the Connecticut Workers' Compensation Act.

## IV.

In sum, the Court GRANTS IN PART and DENIES IN PART Defendant's Motion for Summary Judgment [doc. # 46]. The Court GRANTS summary judgment as to all of Ms. King's claims other than her claim that Navy personnel acted negligently in clearing Building 83 for her return to work on February 10, 2003. The Court will issue a trial schedule by separate order.

IT IS SO ORDERED.


/s/_____Mark R. Kravitz_____
United States District Judge


**Dated at New Haven, Connecticut: June 22, 2007**.